# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA HOESING-SCHULZ,<br><br>    Plaintiff,<br><br>  v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No.  1:19-cv-01450-SAB<br><br>ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL IN PART AND REMANDING ACTION FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 13, 16, 18) |

## I.

## INTRODUCTION

Laura Hoesing-Schulz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from degenerative disc disease of the lumbar and cervical spine; bipolar disorder unspecified; mood disorder; anxiety; and asthma..  For the reasons set forth below,

---

[1] The parties have consented to the jurisdiction of the United States magistrate judge and has been reassigned to the magistrate judge for all purposes.  (See ECF Nos. 8, 9, 19.)

Plaintiff's Social Security appeal shall be granted.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for supplemental security income on March 28, 2016.  (AR 70.)  Plaintiff's application was initially denied on August 23, 2016, and denied upon reconsideration on November 10, 2016.  (AR 88-91, 96-100.)  Plaintiff requested and received a hearing before Administrative Law Judge Sally Reason ("the ALJ").  Plaintiff appeared for a hearing on May 6, 2019.  (AR 31-55.)  On May 28, 2019, the ALJ found that Plaintiff was not disabled.  (AR 12-24.)  The Appeals Council denied Plaintiff's request for review on August 13, 2019.  (AR 1-3.)

### A.      Hearing Testimony

Plaintiff appeared at the May 6, 2019 hearing and testified with the assistance of counsel. (AR 36-52.)

Plaintiff filed her application alleging disability beginning in 1994.  (AR 33.)  At the hearing, the onset date was amended to the date of filing.  (AR 33.)  Counsel mentioned a new PRT that the ALJ excluded under the regulations for the five-day business rule.  (AR 34.)

Plaintiff did not know how old she was.  (AR 37.)  She thought that she was 52 or 53 but was not sure because she does not keep track of her birthdays.  (AR 37.)  Plaintiff completed the tenth grade and attended some college.  (AR 37.)  Plaintiff had some training as a medical assistant.  (AR 37.)  She did not receive a GED.  (AR 38.)

Plaintiff has not worked in the past fifteen years because she has been sick.  (AR 38.) The first five years she had children and was married to a police officer.  (AR 38.)  She was a homemaker.  (AR 38.)  Her youngest daughter is now twenty-one years old.  (AR 38.)  Plaintiff filed for benefits because she got divorced, there was no money coming in, and she could not work.  (AR 38.)  Prior to filing her application for benefits, she had been receiving child support from her husband.  (AR 38.)

Plaintiff previously received SSI benefits for her depression and bipolar disorder before she was married, but it stopped after she was married.  (AR 38.)  She is unable to work because

1    she cannot be around people.  (AR 39.)  She gets very frightened ever since her youngest

2    daughter was born.  (AR 39.)  Plaintiff has been married three times and that is why none of her

3    marriages worked out.  (AR 39.)  Plaintiff is fine with her children.  (AR 39.)  She knows them

4    and they stayed home.  (AR 40.)

5       Plaintiff's daughter gets the groceries and deals with the household needs.  (AR 40.)  She

6    has been doing this for a long time because Plaintiff does not leave the house.  (AR 40.)  Plaintiff

7    has been treated by a psychiatrist, Dr. Guzman, since 2015 or 2016.  (AR 40, 41.)  He is a

8    telemedicine doctor and tries to help her.  (AR 40.)  She sees him every two to three weeks and

9    he prescribes medication and talks to Plaintiff.  (AR 40.)  Prior to that she was treated by Dr.

10    Farber.  (AR 41.)

11       Plaintiff has back problems and is in pain.  (AR 42.)  She takes medication that makes her

12    very tired and she sleeps.  (AR 42.)  She has been taking the medication for five years.  (AR 42.)

13    It helps her a little bit.  (AR 42.)  She also uses medical marijuana.  (AR 42.)  Plaintiff has not

14    tried to find a job cause she was receiving child support.  (AR 42-43.)  Her youngest child from

15    her most recent marriage is twelve.  (AR 43.)  She receives $1,000.00 per month in child support.

16    (AR 43.)  She is unable to work due to her social phobia, back and neck.  (AR 43.)  Her neck is

17    twisted inside.  (AR 43.)  She cannot turn it or look up or down without pain.  (AR 43.)  It causes

18    her to have migraines and dizziness.  (AR 43.)  She takes medication for the dizziness.  (AR 43.)

19       Plaintiff just had a procedure at the hospital for her pain.  (AR 43-44.)  She received two

20    shots, a steroid and a cortisone injection.  (AR 44.)  They want to give her another shot in a

21    month.  (AR 44.)  The shot did not work, in a week she was back in pain.  (AR 44.)

22       Plaintiff's pain travels down the back of her legs and all the way up to her neck.  (AR

23    44.)  It also travels down her arms.  (AR 44.)  The pain is constant and walking, sitting for long

24    periods, and laying down for long periods make it worse.  (AR 44.)  Plaintiff has to move

25    around.  (AR 44.)  She is most comfortable when her legs and back are elevated on a pillow.

26    (AR 45.)  Plaintiff is almost always in bed in that position, eight hours a day.  (AR 45.)  From the

27    time she wakes up until it is time to go to sleep she will be in bed other than to use the restroom

28    or to go outside on the front porch to get some fresh air.  (AR 45.)

1    Plaintiff has been having migraines every day for the past two weeks since they did the

2    procedure.  (AR 45.)  She takes medication that works for a while and then she will have to take

3    the medication again.  (AR 45-46.)  The medication makes her sleepy and makes her shake.  (AR

4    46.)

5    Plaintiff can sit for half an hour before she needs to walk around.  (AR 46.)  She can

6    stand in one position for a few minutes.  (AR 46.)  She can walk a half block and then must rest.

7    (AR 46.)  She is not sure how long she would need to rest before she could walk again because

8    she has never tried it.  (AR 46.)  Plaintiff can only pick up a couple pounds because of her arm.

9    (AR 46.)  She has torn muscles in both arms and since then can only pick up a couple pounds

10   because both arms pull and start burning.  (AR 46-47.)

11   Plaintiff suffers from bipolar disorder and has good and bad days.  (AR 47.)  She does not

12   know what a good day would look like.  (AR 47.)  Probably a day when she is not crying.  (AR

13   47.)  She can listen to her twelve-year old daughter read her homework and try to help her.  (AR

14   47.)  She would not be screaming at the kids to leave her alone.  (AR 48.)  A bad day would be

15   the total opposite.  (AR 48.)  She has more bad days than good days.  (AR 48.)  When she is not

16   feeling well she wants everyone to leave her alone.  (AR 48.)

17   Plaintiff has trouble concentrating and focusing.  (AR 48.)  She will put off paying her

18   bills because she does not want to get on the computer to try to do it.  (AR 48.)  She is afraid of

19   her bills and sometimes her daughter will have to pay them.  (AR 48.)

20   Plaintiff does not ever leave the house.  (AR 48.)  When asked how she attended medical

21   appointments if she never leaves the house, Plaintiff stated that was the only time she leaves to

22   go to the doctor.  (AR 48-49.)  She goes to see Dr. Guzman, Dr. DeSilva, and the Rural Health

23   Clinic for doctor appointments.  (AR 49.)  She does not go grocery shopping but she will go to

24   the pharmacy sometimes to pick up her medication.  (AR 49.)  She also goes to the dispensary to

25   get her marijuana.  (AR 49.)  She goes out side to the shed to use her marijuana because she does

26   not smoke it in the house.  (AR 49.)

27   Plaintiff no longer does any household chores.  (AR 49.)  Her daughter has done all the

28   cooking for the past three years.  (AR 49.)  She will sometimes clean the bathroom sink.  (AR

49.)  Her daughters do the grocery shopping and laundry.  (AR 50.)  Plaintiff will sometimes have problems getting dressed when her arms hurt.  (AR 50.)  She will sometimes have problems getting in and out of the shower when her back hurts and is spasming.  (AR 50.)  Dr. DeSilva wants to do another epidural since it has been years since the other ones.  (AR 50.)

Even if Plaintiff had a job where she did not need to be around other people she could not work because she cannot stand, cannot sit, and needs to lay down with her feet up to not be in pain.  (AR 50.)  Plus her medications make it impossible for her to work.  (AR 51.)  She takes medical marijuana five times a day and it makes her sleepy.  (AR 51.)  Plaintiff takes naps during the day and does not sleep through the night.  (AR 51.)  She has to take the marijuana at night also.  (AR 51.)  She wakes up at night because she is in pain, will wake up sweating, will wake up because she cannot sleep, or because she is feeling nauseous until her headaches wake her up.  (AR 51.)

Plaintiff uses a nebulizer for her asthma.  (AR 52.)  It usually only bothers her when she has a cold or if it is dusty and she is outside.  (AR 52.)  Plaintiff stopped smoking a little over a year ago and her breathing has improved since then.  (AR 52.)  She will have more problems breathing if it is dusty outside.  (AR 52.)

A vocational expert, Carmen Roman also testified at the hearing.  (AR 53-55.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since the application date of March 28, 2016.

- Plaintiff has the following severe impairments: degenerative disc disease of the lumbar and cervical spine; bipolar disorder unspecified; mood disorder; anxiety; and asthma.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except for occasional postural activities, avoid

concentrated exposure to pulmonary irritants, limited to unskilled work with no public contact and occasional contact with co-workers and supervisors.

- Plaintiff has no past relevant work.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not an issue because Plaintiff does not have past relevant work.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability as defined in the Social Security Act since March 28, 2016, the date the application was filed.

(AR 17-24.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the

claimant is disabled. If not, proceed to step four.

Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred by rejecting all physician opinions in the record and

1  making her own findings of regarding Plaintiff's limitations and that the residual function

2  capacity findings are not supported by substantial evidence because the ALJ failed to provide

3  adequate reasons to reject the opinion of Dr. Kumar, her treating physician.

4      Defendant counters that the ALJ properly conducted the step two analysis and considered

5  Plaintiff's mental impairments in developing her residual functional capacity and the opinion is

6  supported by substantial evidence.  Defendant further argues that the ALJ properly evaluated the

7  evidence in the record and found that Plaintiff was more limited than found by the agency

8  physicians.  Defendant contends that the ALJ properly rejected the extreme limitations opined by

9  Dr. Kumar as inconsistent with the treatment records where the agency sent six requests to Dr.

10  Kumar for records which were not responded to and the ALJ relied on the physician notes that

11  were provided by Plaintiff.

12      Plaintiff replies that the cases relied on by Defendant are inopposite and do not support

13  that the ALJ's opinion is without error.  Further, Plaintiff argues that the Commissioner relies on

14  Plaintiff's daily activities to support the residual functional assessment, but she has argued that

15  the ALJ erred in evaluating her daily activities.

16      **A.      Physician Opinion**

17      Plaintiff argues that the ALJ erred by rejecting the opinion of Dr. Kumar, Plaintiff's

18  treating physician.  Defendant counters that the ALJ provided proper reasons to reject the

19  extreme limitations opined by Dr. Kumar.  Plaintiff replies that the ALJ erred by relying on notes

20  that she thought were Dr. Kumar's and ignored evidence that supported his opinion.

21      The weight to be given to medical opinions depends upon whether the opinion is

22  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

23  821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded

24  more weight than those of non-examining physicians, and the opinions of examining non-

25  treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495

26  F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or

27  examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject

28  it by providing specific and legitimate reasons that are supported by substantial evidence."

1    Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The

2    contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific,

3    legitimate reason for rejecting a treating or examining physician's opinion, however, "it may

4    constitute substantial evidence when it is consistent with other independent evidence in the

5    record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept

6    the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.

7    Thomas, 278 F.3d at 957.

8         While recognizing that he was a long term treating physician, the ALJ gave little weight

9    to Dr. Kumar's June 2016 assessments.  (AR 22.)  The ALJ found that the record established that

10   Plaintiff had only mild degenerative changes in the shoulders and degenerative changes in the

11   spine and the cumulative evidence does not warrant acceptance of the two pound weight

12   limitation or his assessed limitations on postural or exertional restrictions.  (AR 22.)  Dr. Kumar

13   appeared to accept Plaintiff's allegations in full but his records do not suggest the degree of

14   severity opined.  (AR 22.)

15        The ALJ considered the June 22, 2016 letter from Dr. Kumar.[2]  The letter states:

16        This letter is in regards to the above named patient.  Ms. Hoesing has been a
          patient in my office for years.  She is currently diagnosed with degenerative disc
17        disease and a shoulder injury.  Due to the damage to the right bicep muscle and
          the damage to her shoulder socket, which at this time is not repairable, she is
18        unable to lift more the 2 lbs.  She is unable to reach, bend, or stoop down.  Over
          exerting herself will lead to risk of pinching a nerve in her back due to the bulging
19        discs she has.  With these problems she is having she is unable to sit or stand for
          longer the 5 min at a time.  She has to lay down on her side when she with ice
20        packs [sic] and multiple pillows to keep the pain some what under control.  The
          patient rates her pain a 6/10 or 7/10 most of the time.  Her fingers go numb after
21        writing or grasping things after just a few minutes.  If she sits or stands to [sic]
          long her legs start to tingle and go numb also.   She is currently seeing a
22        Psychiatrist for ADD, PTSD, Anxiety, and Depression.  Also she uses a nebulizer
          and an air purifier at home for her Asthma.  The patient also has to use a cane and
23        walker to ambulate.  If you have any further questions regarding this matter please
          call my office.
24

25   (AR 478.)

26        The records submitted by Dr. Kumar's office include imaging and laboratory test results,

27

28   ---

     [2] The letter itself is unsigned, but the ALJ accepted it as Dr. Kumar's opinion.

notes from doctors to which Plaintiff was referred for rectal and shoulder pain, a prescription for medical marijuana from Dr. Avila, a letter regarding pharmaceutical coverage, and the unsigned June 2016 letter.  (AR 442-492.)  Relevant documents are described below.

Plaintiff had a consultation with Dr. Shah on November 10, 2009.  (AR 491-492.) Plaintiff reported a history of right arm pain with no history of injury.  (AR 491.)  The letter states:

> PHYSICAL EXAMINATION:
> General: She is a healthy appearing female in no distress.
> Psych: Awake, alert, and oriented.
> HEENT: Atraumatic normocephalic.
> Neck: Supple and symmetric.
> Lungs: Non-labored breathing and no wheezing evident.
> Chest: Regular rate and rhythm.
> Abdomen: Nondistended
> Musculoskeletal: Examination of the right arm shows intact skin and soft compartments.  No atrophy.  There is no erythema or warmth.  She has pain with gentle range of motion of her wrist and digits although she has pain on active range of motion.  She also has positive tenderness throughout her flexor tendons worse along the small finger.  She has a mildly positive compression test at the wrist.  Sensation to light touch is otherwise intact in all digits and there is a brisk capillary refill.
> IMPRESSION AND PLAN:
> Ms. Schulz has possible flexor tendonitis versus severe carpal tunnel.  At this time, I would recommend MRI of the wrist and hand to evaluate for any soft tissue swelling as well as EMG/nerve conduction velocity to evaluate for carpal tunnel syndrome and the patient will follow-up after this is obtained.  In the meantime, she should work on icing, elevating, and limiting activities to the right hand other than gentle range of motion exercises.

(AR 491-492.)

A February 19, 2013 chest x-ray finding: "1. Mid bronchitis not seen in prior study.  2. No acute cardiopulmonary disease."  (AR 481.)

A November 20, 2015 CT scan of the chest finding: "1. Indeterminate 7 mm nodule within the lateral basal segment of the right lower lobe. 2. At least 2 small gallstones.  3. There is focal thickening (up to 4 mm) of the inferior aspect of the wall of the gallbladder fundus. Finding is nonspecific and may possibly be due to focal adenomyomatosis."  (AR 465, 469, 471, 479.)

An April 5, 2016 CT of the soft tissue of the neck finding: "1.  Unremarkable appearance of the neck.  2. For the paranasal findings please refer to the same the sinus CT scan.  3. Spinal

1  degenerative changes are seen." (AR 447.)

2      An April 5, 2016, CT scan of the chest finding: "1. There is new 7 x 8 mm nodule within

3  the anterior segment of the right upper lung with irregular margins.  Finding is not specific

4  inflammatory infectious or neoplastic conditions may cause this appearance.  Clinical correlation

5  along with close imaging follow-up is recommended.  2. There is an indeterminate 6 x 7 mm

6  nodule within the right lower lung as before.  3. There is focal thickening up to 7 mm of the

7  gallbladder fundus wall as before. Finding is nonspecific if also clinically indicated correlation

8  with gallbladder ultrasound –/+ MRI/MRCP may be of value. 4. There are a few small gallstones

9  as before." (AR 449.)

10     A May 13, 2016 CT scan of the chest finding: "1. Previously seen 8 mm spiculated right

11 upper lobe nodule is not seen on current exam and has resolved.  There is a stable 6 mm well

12 defined right lower lobe nodule.  2. Marker was placed along the right anterosuperior chest wall.

13 Underlying the marker there is 4 x 8 mm versus 3 x 4 mm previously superficial subcutaneous

14 nonspecific nodule/cyst without definite enhancement.  There is new minimal adjacent

15 subcutaneous fat stranding.  3. There is at least one small calcified gallstone as before.  Focal

16 thickening and calcification up to 4 mm thick of the antero- inferior wall of the gallbladder

17 fundus is similar to the prior exam.  4. Spinal degenerative changes are seen.  (AR 461, 474.)

18     A May 17, 2016 CT scan of the brain and head finding:  "1. Unremarkable appearance of

19 the brain.  2. Mild mucosal thickening is seen in the right maxillary and right sphenoid sinuses."

20 (AR 443, 463.)

21     A May 17, 2016 CT scan of the soft tissues of the neck finding: "1. Tonsillar hypertrophy

22 is suggested.   No peritonsillar abscess is noted.  2. Sherry cervical lymphadenopathy is

23 suggested.  3. Mid cervical disc disease from C3-C4 through C6-C7 level are demonstrated with

24 straightening of the cervical lordosis.  4. Mild right maxillary sinus mucosal thickening is noted."

25 (AR 445, 462.)

26     There is also treatment note from Dr. Deichert dated August 12, 2013 where Plaintiff was

27 seen complaining of severe rectal pain for the prior 12 to 24 hours.  (AR 460.)  Plaintiff was

28 found to have several small external hemorrhoids.  (AR 460.)  Dr. Deichert did not perform a

1   digital exam due to significant tenderness on the outside and pain.  (AR 460.)

2   A letter from Dr. Cannata regarding a consultation on January 31, 2013 for a
3   colonoscopy.  (AR 484-485.)  On physical examination, Dr. Cannata noted Plaintiff was alert
4   and oriented with no fluctuation in consciousness, afferent, sensory, and motor efferent are
5   grossly intact.  (AR 485.)  Examination of the heart notes first and second sounds auscultated
6   with no additional sounds.  (AR 485.)  Plaintiff had adequate air exchange in the right and left
7   lung fields with some minor wheezing noted.  (AR 485.)  Her abdomen was soft with no pain or
8   tenderness.  (AR 485.)  Examination of the upper and lower extremities notes no acute pain or
9   tenderness.  (AR 485.)

10   Plaintiff argues that the ALJ erred by rejecting Dr. Kumar's opinion because the ALJ
11   simply made the conclusory statement that Plaintiff's degenerative changes were only mild and
12   the severity was not support by his own treatment notes.  Plaintiff concedes that there is not a
13   single treatment note from Dr. Kumar in the record and argues that the notes submitted do not
14   include a physical examination relevant to Plaintiff's physical impairments.

15   Defendant argues that Plaintiff's contention that the ALJ erred because the record does
16   not contain Dr. Kumar's treatment notes is unfounded.  Defendant notes that Dr. Kumar did not
17   respond to six attempts by the Department of Social Services to obtain treatment records.  (AR
18   357-358 (April 20, 2016 Second Request for Records), 363-364 (June 27, 2016 Second Request
19   for Records), 420-423 (November 1, 2016 Second Request for Records).)  On August 7, 2018,
20   Plaintiff's represented submitted what she stated was medical records from D. Kumar.  (AR
21   442.)

22   The ALJ need not accept the opinion of any physician that is brief, conclusory, and
23   unsupported by clinical findings.  Thomas, 278 F.3d at 957.  Here, Dr. Kumar did not submit
24   treatment notes and those notes that were submitted do not contain objective findings to support
25   Dr. Kumar's opinion regarding the two pound weight limitation or his assessed limitations on
26   postural or exertional restrictions.  This is a specific and legitimate reason to reject Dr. Kumar's
27   opinion.

28   Plaintiff argues that the ALJ was required to further develop the record due to the

12

1  absence of treatment notes from Dr. Kumar.  The claimant has the duty to prove that she is

2  disabled.  42 U.S.C. § 423(c)(5)(A).  The ALJ has an independent "duty to fully and fairly

3  develop the record and to assure that the claimant's interests are considered."  Widmark v.

4  Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443

5  (9th Cir. 1983)).  The ALJ must be especially diligent when the claimant is unrepresented.

6  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011)  "[W]here the claimant is not represented,

7  it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and

8  explore for all the relevant facts.  He must be especially diligent in ensuring that favorable as

9  well as unfavorable facts and circumstances are elicited."  Higbee v. Sullivan, 975 F.2d 558, 561

10  (9th Cir. 1992) ( quoting Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978)).  The ALJ may

11  discharge this duty by subpoenaing or submitting questions to the claimant's physician,

12  continuing the hearing, or keeping the record open after the hearing to allow the claimant to

13  supplement the record.  Tonapetyan, 242 F.3d at 1150.

14      Here, Plaintiff was represented by counsel during the underlying proceedings.  The

15  Commissioner sent multiple requests to Dr. Kumar seeking medical records, and counsel

16  submitted records that were designated as "Medical Records – Dr. Kain Kumar (50 pgs.,

17  11/10/2009-5/17/2016)".  (AR 442.)  The ALJ reasonably could assume that these were the

18  records of Dr. Kumar that were being submitted by Plaintiff.

19      Further, the ALJ has a duty to further develop the record where the evidence is

20  ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the

21  evidence.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at

22  1150.  Here, neither the ALJ nor any other physician opined that the record was ambiguous or

23  inadequate to allow for the proper evaluation of the evidence.  The facts in this case are not

24  similar to other instances in which the ALJ was found to have a duty to further develop the

25  record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician

26  who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ

27  erred by failing to obtain disability determination from the Veteran's Administration); Bonner v.

28  Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if

claimant's benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

The ALJ also found that the cumulative evidence in the record did not support the acceptance of Dr. Kumar's opinion.  (AR 22.)  In the opinion, the ALJ considered that Plaintiff had a CT of the cervical spine that primarily showed only degenerative changes and MRI's of the cervical and lumbar spines in 2019 that showed degenerative changes and foraminal stenosis. (AR 21, 445, 1317-1326., 1335.)  Further, the ALJ noted that on examination on March 20, 2019, Dr. Desilva found Plaintiff to have full range of motion in the cervical spine, normal neurological findings, and negative straight leg raising after which she had a steroid injection. (AR 21, 1330.)  Dr. Desilva's examination of Plaintiff's cervical spine (motor) noted right elbow- flexion and extension: 5/5.   (AR 1330.)  Left Elbow- flexion an extension: 5/5.  (AR 1330.)  Right Wrist - flexion and extension 5/5.  (AR 1330.)  Left Wrist - flexion and extension 5/5.  (AR 1330.)  Right Hand- grip 5/5.  (AR 5/5.)  Left Hand- grip 5/5.  (AR 1330.)  Plaintiff had a negative straight raise bilateral.  (AR 1330.)

Examination of the spine showed extension - full range of motion- 30 degrees with pain. (AR 1330.)  On palpation, there was no pain to the cervical spine or cervical facets.  (AR 1330.) There was pain with left lateral rotation and no pain with right lateral rotation.  (AR 1330.) Plaintiff had full range of motion - 30 degrees.  (AR 1330.)  Sensation examination of the upper extremities was unremarkable.  (AR 1330.)  The ALJ noted the similar findings of Dr. Desilva on March 29, 2019, and that Plaintiff received a cervical injection on April 10, 2019.  (AR 1334, 1337.)

The ALJ also considered that in October 2016, Plaintiff had essentially unremarkable musculoskeletal and neurologic examinations.  (AR 21.)  Plaintiff was seen by Dr. Sharma on October 19, 2016.  (AR 685-690.)  On musculoskeletal examination, Dr. Sharma found that Plaintiff had a normal gait; grossly normal tone and muscle strength; full painless range of motion of all muscle groups and joints.  (AR 688.)  Plaintiff did have some diffuse muscle

1   tightness and tenderness in the upper and lower back.  (AR 688.)  Neurologic examination notes

2   cranial nerves are grossly intact without any focal deficits.  (AR 688.)

3        Plaintiff was seen again for a follow up on October 20, 2016  (AR 680-684.)  Again, the

4   record notes that Plaintiff had a normal gait; grossly normal tone and muscle strength; full

5   painless active range of motion of all muscle groups and joints in the back and spine.  (AR 682.)

6   There was no edema, deformity, mass, or "TTP".  (AR 682.)  Plaintiff was found to have

7   negative Hoffman's sign bilateral lower extremities.  (AR 682.)  Neurologic examination notes

8   cranial nerves are grossly intact without any focal deficits.  (AR 682.)

9        The ALJ considered that Plaintiff had a consultative examination by Dr. To on August 6,

10  2016.  (AR 21, 367-372.)  Plaintiff reported that she was no longer taking pain medication due to

11  lack of medical coverage and was taking medical marijuana for her pain.  (AR 368.)  Plaintiff

12  was found to ambulate with a normal gait with no assistive device used.  (AR 21, 369.)  On

13  musculoskeletal examination, Dr. To found Plaintiff to have normal muscle tone and mass.  (AR

14  370.)  Range of motion in all extremities was normal.  (AR 370.)  Range of motion of the

15  cervical spine was within normal limits without pain.  (AR 21, 370.)  Range of motion of the

16  thoracolumbar spine was 69/90 with overall thoracolumbar spine motion described by Dr. as

17  mildly decreased.  (AR 21, 370-371.)  All joints were normal.  (AR 21, 370.)  Neurological

18  examination was normal.  (AR 21, 371.)  Dr. To noted that Plaintiff was oriented to time, place,

19  person, and purpose.  (AR 371.)  Memory appeared to be intact as Plaintiff was able to recall

20  relevant data pertaining to the current medical condition.  (AR 371.)  Dr. To found no

21  appearance of a problem with coordination.  (AR 371.)  Plaintiff's deep tendon reflexes were

22  symmetric and 2.  (AR 371.)  The cranial nerves were grossly intact.  (AR 371.)  Motor function

23  was normal and motor strength was 5/5 throughout.  (AR 371.)  Sensory was grossly intact.  (AR

24  371.)  Dr. To reported there was no evidence of radiculopathy.  (AR 21, 371.)

25        Dr. To opined that Plaintiff could push, pull, lift, and carry 20 pounds occasionally and

26  10 pounds frequently due to neck and back pain; stand sit and walk six hours in an eight our

27  workday.  (AR 371-372.)  She could bend, kneel, stoop, crawl, and crouch on a frequent basis.

28  (AR 372.)  Plaintiff could walk on uneven terrain, climb ladders or work at heights on a frequent

1   basis.   (AR 372.)   She had no restrictions of the hands for fine and gross manipulative

2   movements.  (AR 372.)  There were no restrictions in hearing and seeing.  (AR 372.)  Assistive

3   devices were not medically necessary for ambulation.   (AR 372.)   Plaintiff was restricted from

4   working with fumes or dust particles due to asthma and COPD.  (AR 372.)

5       The ALJ also noted other records that were in accord with Dr. To's findings.  (AR 21.)

6   The ALJ noted the January 31, 2013 examination of Dr. Cannata discussed above (AR 485), the

7   October 19, 2016 examination by Dr. Sharma (AR 688), and a January 30, 2019 emergency

8   room visit (AR 1220.)  Plaintiff was seen on January 30, 2019 after she fell in her kitchen five

9   days prior.   (AR 1220.)   On examination of the extremities, Plaintiff was found to have no

10   deformity, no tenderness, and no limitation of motion.   (AR 1220.)   Plaintiff's strength and

11   sensation were noted to be normal.  (AR 1220.)

12       The ALJ properly considered that Dr. Kumar's opinion was inconsistent with the other

13   medical evidence in the record and this was a specific and legitimate reason to reject Dr.

14   Kumar's opinion.

15       Finally, the ALJ rejected Dr. Kumar's opinion because he appeared to accept Plaintiff's

16   subjective complaints in full.  (AR 22.)  An ALJ can reject a physician's opinion that is premised

17   on a claimant's subjective complaints that have been properly discounted.   Fair v. Bowen, 885

18   F.2d 597, 605 (1989).   Plaintiff has not challenged the adverse credibility finding and has

19   therefore waived the issue.   Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).   In his

20   opinion, Dr. Kumar clearly related Plaintiff's subjective complaints.   Dr. Kumar set forth

21   Plaintiff's allegations regarding her subjective complaints of pain and regarding her symptoms

22   such as that her fingers go numb after writing or grasping things for just a few minutes and she

23   has to lay down on her side with ice packs and multiple pillows to keep the pain somewhat under

24   control.   The ALJ properly considered that the opinion was based on Plaintiff's subjective

25   complaints which is a specific and legitimate reason to reject Dr. Kumar's opinion.

26       The ALJ did not err in providing little weight to the opinion of Dr. Kumar because he

27   provided specific and legitimate reasons to reject his opinion.

28       Plaintiff argues that the ALJ's opinion is not supported by substantial evidence in the

16

1   record because the ALJ failed to adequately explain the rejection of Dr. Kumar's opinion.  As the

2   Court has found that the ALJ did not err in addressing Dr. Kumar's opinion and Plaintiff has not

3   developed any other argument as to why the physical residual capacity findings are not

4   supported, the Court finds that the ALJ did not err in determining Plaintiff's residual functional

5   capacity.

6           **B.**    **Mental Residual Functional Capacity Findings**

7        Plaintiff argues that the mental residual capacity determination is not supported by

8   substantial evidence in the record because it is contradicted by every medical opinion in the

9   record.

10        A claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20

11   C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20

12   C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, §

13   416.920(b) and (c), as well as the total limiting effects caused by medically determinable

14   impairments and the claimant's subjective experiences of pain, § 416.920(e)."  <u>Garrison</u>, 759

15   F.3d at 1011.  At step four the RFC is used to determine if a claimant can do past relevant work

16   and at step five to determine if a claimant can adjust to other work.  <u>Id.</u>  "In order for the

17   testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the

18   claimant's functional limitations, both physical and mental' supported by the record."  <u>Thomas</u>,

19   278 F.3d at 956.

20        Here, Plaintiff contends that the ALJ erred because the agency physicians found that she

21   did not have a severe impairment and there are no other opinions in the record to inform that ALJ

22   of Plaintiff's limitations.  Plaintiff contends that because the ALJ rejected the opinions of the

23   agency physicians substantial evidence does not support the mental residual functional capacity

24   assessment.  Defendant counters that there is no requirement that the residual functional capacity

25   assessment need be identical to any doctor's opined limitations and there is substantial evidence

26   in the record to support the ALJ's finding that Plaintiff retains the capacity to perform unskilled

27   work without public contact and only occasional interaction with co-workers and supervisors.

28        At step two, the ALJ determined that Plaintiff's mental impairment was severe.  (AR 18.)

1    In making this finding, the ALJ found that Plaintiff had mild limitations in her ability to

2    understand, remember or apply information and to adapt or manage herself; and moderate

3    limitations in her abilities to interact with others and to concentrate, persist or maintain pace.

4    (AR 18.)

5        In developing Plaintiff's mental residual functional capacity, the ALJ considered that

6    based on the evidence in the record that Plaintiff overmedicates at times, but still presents as

7    cognitively intact.  (AR 20.)  The ALJ found that historically, there was not significant objective

8    data of a mental impairment.  (AR 21.)  The reported mental status examinations in the record

9    have been normal or essentially normal.  (AR 21, 325-350, 440, 1188.)  Review of these records

10    shows the following.

11        On December 18, 2013, Plaintiff was seen for proctologic pain and was found to be in

12    acute distress.  (AR 440.)  Plaintiff was lucid and able to converse.  (AR 440.)

13        Plaintiff was seen by Dr. Farber on March 9, 2015, stating that she was doing much better

14    and was more focused and less depressed with a steady mood.  (AR 349.)  She reported

15    generalized anxiety, worrying about big and small issues, as well as physical symptoms of

16    restlessness, tension, insomnia, and irritability.  (AR 349.)  She complained of mood swings that

17    were rapidly changing over a matter of hours that affected her functioning.  (AR 347.)  She also

18    reported that she had racing thoughts that interfered with her ability to organize thinking and

19    attention and concentration.  (AR 349.)  Plaintiff was alert and oriented to time, place, and

20    person.  (AR 349.)  She was cooperative and had good grooming, hygiene, eye contact.  (AR

21    349.)  There were no abnormal involuntary movements evidenced.  (AR 349.)  Her speech was

22    near normal in rate, rhythm, tone, and volume with no language abnormalities noted.  (AR 349.)

23    Her thought process and progression was good without major aberration.  (AR 349.)  Thought

24    content was consistent and there was no evidence of auditory or visual hallucinations or paranoia

25    and no suicidal or homicidal ideation.  (AR 349.)  Her mood was reported to be euthymic with

26    affect congruent to mood.[3]  (AR 349.)  Plaintiff exhibited good insight and judgment into and

27

28    [3] Moderation of mood, not manic or depressed.  Stedman's Medical Dictionary 678 (28th Ed. 2006).

1   about the mental problems.  (AR 349.)  Higher cognitive functioning was in normal range for

2   reasoning and logic and was age appropriate.  (AR 349.)  She was evaluated for attention,

3   concentration, and memory which suggested moderate decline in these areas of mental

4   functioning.  (AR 349.)

5          Plaintiff was seen by Dr. Farber on May 4, 2015, and reported that she had been out of

6   her medication due to an insurance issue and had only restarted her medication two days prior to

7   the appointment.  (AR 347.)  Her reported complaints and the examination findings remain the

8   same other than that her mood is reported to be labile[4] and affect is congruent to mood.  (AR

9   347.)

10         On June 30, 2015, Plaintiff was seen by Dr. Farber and reported that she had court the

11  following day for her child custody case.  (AR 345.)  Her family dog had bit her daughter and the

12  dog had to be put down.  (AR 345.)  Since then her ex-husband was trying to get custody of the

13  children.  (AR 345.)  She was anxious and upset that he might gain custody and was "not sure

14  she could handle it" if the decision went his way.  (AR 345.)  Symptom complaints and

15  examination findings remained the same.  (AR 345.)  She was again evaluated for attention,

16  concentration, and memory which suggested a moderate decline in these areas of mental

17  functioning.  (AR 345.)  Plaintiff was assessed to have a Global Assessment of Function

18  ("GAF") of 45.[5]  (AR 345.)

19         Plaintiff saw Dr. Farber on August 17, 2015; October 6, 2015; December 1, 2015; and

20  January 15, 2016; and while she sometimes reported that she was doing okay after that her court

21  case had been postponed until October, she continued to have the same mental status findings

22  and evaluation for attention, concentration, and memory results suggested a moderate decline in

23  these areas of mental functioning.  (AR 333, 339, 341, 343.)

24  ───────────────

25  [4] Denoting free and uncontrolled mood or behavioral expression of the emotions.  Stedman's Medical Dictionary
    1037 (28th Ed. 2006).

26  [5] A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of
27  functioning.  It is rated with respect only to psychological, social, and occupational functioning, without regard to
    impairments in functioning due to physical or environmental limitations.  Cornelison v. Astrue, 2011 WL 6001698,
28  at *4 n.6 (C.D. Cal. Nov. 30, 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of
    Mental Disorders ("DSM–IV"), at 32 (4th ed. 2000)).

1    Plaintiff saw Dr. Farber on February 9, 2016.  (AR 337.)  She reported that she had run

2    out of her medication and complained of anxiety and irritability.  (AR 337.)  On March 22, 2016,

3    Plaintiff saw Dr. Farber and reported that she was doing much better and was able to get all her

4    medication refilled.  (AR 335.)  She reported that her mood was steady and she was more

5    focused.  (AR 335.)  Examination findings at both appointments remain the same and there is no

6    indication of any testing for attention, memory, or concentration.  (AR 335, 337.)

7    Plaintiff saw Dr. De Guzman on July 9, 2018.  (AR 1188.)  She reported sporadic

8    memory lapses affecting keeping up with her finances.  (AR 1188.)  She was compliant with her

9    medication with no side effects.  (AR 1188.)  Plaintiff was alert and oriented to time, place, and

10   person.  (AR 1188.)  There were no involuntary movements evidenced.  (AR 1188.)  Her speech

11   was near normal in rate, rhythm, tone, and volume with no language abnormalities noted.  (AR

12   1188.)  Thought process and progression was good without any major aberration.  (AR 1188.)

13   Thought content was consistent with no evidence of auditory or visual hallucinations or paranoia.

14   (AR 1188.)  Plaintiff mood was anxious and her affect was congruent to her mood.  (AR 1188.)

15   Plaintiff's insight and judgment were fair.  (AR 1188.)  Plaintiff was to continue her medication

16   and advised to restart individual counseling.  (AR 1189.)

17   Plaintiff saw Dr. De Guzman on August 28, 2018.  (AR 1190.)  Plaintiff had been sick

18   and her daughter had been taking care of the bills.  (AR 1190.)  Plaintiff was going to be away

19   for three weeks in October.  (AR 1190.)  She was anxious due to going away and leaving her

20   older daughter to take care of her younger daughter, her financial situation, and the pending

21   disability hearing.  (AR 1190.)  Plaintiff had not been seeing her counselor, but was compliant

22   with medication with no side effects.  (AR 1190.)  On examination, Plaintiff was found to be

23   alert and oriented to time, person, and place.  (AR 1190.)  There were no involuntary movements

24   evidenced.  (AR 1190.)  Her speech was near normal in rate, rhythm, tone, and volume and there

25   were no language abnormalities noted.  (AR 1190.)  Thought processes and progression was

26   good without any major aberration.  (AR 1190.)  Thought content was consistent with no

27   evidence of auditory or visual hallucinations or of paranoia.  (AR 1190.)  Mood was anxious and

28   affect was congruent to mood.  (AR 1190.)  Insight and judgment were fair.  (AR 1190.)

1    Plaintiff was to continue her medications and restart individual counseling.  (AR 1191.)  She was

2    getting a ninety day refill on her prescriptions because she was going to be out of town for an

3    extended period visiting with her brother and his family.  (AR 1191.)

4           Plaintiff was seen by Dr. De Guzman on October 30, 2018.  (AR 1192.)  She expressed

5    concern regarding the outcome of her disability benefits hearing and ongoing financial concerns.

6    (AR 1192.)   She was compliant with her medication with no side effects.   (AR 1192.)

7    Examination findings remain the same.  (AR 1192.)   Plaintiff was to restart her individual

8    therapy soon and was continued on her medications.  (AR 1193.)

9           The ALJ also considered that when Plaintiff presented to establish care with Dr. Sharma

10   on October 19, 2016, she was noted to be alert, oriented times 3, and had appropriate affect and

11   demeanor.  (AR 21, 688.)  On July 9, 2018, notwithstanding her history of bipolar disorder,

12   unspecified; unspecified mood disorder, social phobia, and ADHD examination by Dr. De

13   Guzman noted that she had an anxious mood, but was alert, oriented times four, without

14   involuntary movements and with normal thought processes and thought content.  (AR 21-22,

15   1188.)  On February 16, 2018, psychotherapy notes from Maria Holm, LCSW described Plaintiff

16   as agitated and tearful, but with intact memory, fair judgment and insight.  (AR 22, 590.)  She

17   diagnosed Plaintiff with major depressive disorder, single episode, mild and generalized

18   depressive disorder.  (AR 22, 590.)

19          On June 22, 2018, Dr. Cosner assessed Plaintiff was assess with major depressive

20   disorder, recurrent, moderate and generalized anxiety disorder.  (AR 22, 563.)  On January 3,

21   2019, Dr. Willis described Plaintiff as depressed, tearful, and with poor insight.[6]  (AR 22, 1282.)

22   On February 7, 2019, Dr. Willis noted that Plaintiff had good insight and judgment, as well as

23   intact memory, and appropriate affect and demeanor.  (AR 21, 1272.)  In March 2019, Plaintiff

24   denied having crying spells, depression, sadness, or suicidal thoughts.  (AR 22, 1265.)

25   _____

26   [6] The ALJ found that this was in the context of her responses to her now deceased mother's impaired health and
     functioning.  (AR 1282.)  But the record states, "long talk about the difficulty of having a mom that is basically
     moaning and shaking all the time.  Encouraged gently for her to get a grip and take tiny steps every day to improve

27   herself, start some mild yoga, go to church, or listen on line, eat better, stop smoking, etc."  (AR 1282.)  It would
     appear that the comments were in regard to Plaintiff's behavior as there are no indications during this visit that

28   Plaintiff mentioned her mother.

In sum, the ALJ found that Plaintiff, while limited by her mental impairments, generally presents with normal or essentially normal mental status examinations, and appears to function at a much greater level than she acknowledges in her testimony.  (AR 22.)  The ALJ found that it would be reasonable to limit Plaintiff to unskilled work as it appeared that greater demands might exacerbate her physical or mental symptoms.   (AR 22.)   Further, due to her uncomfortableness and anxiety around others, the ALJ precluded her from interactions with unfamiliar audiences (i.e. public contact), and limited her to occasional contact with co-workers and supervisors.  (AR 22.)

Agency physicians, Drs. Berkowitz and Salib, issued opinions on May 24, 2016, and November 3, 2016, respectively, finding that Plaintiff's mental impairments were not severe. (AR 22, 64, 77.)  The ALJ rejected the opinions of the agency physicians finding that Plaintiff had a severe mental impairment.  (AR 22.)  While the ALJ found that the subsequent record demonstrates that Plaintiff had moderate restrictions in her ability to concentrate, persist or maintain pace, no physician opined on how Plaintiff is affected by these moderate limitations. Absent adequate explanation of the record, without specific support from a medical source, and with no testimony from a medical expert, the ALJ appears to have defined her own limitations for Plaintiff.  The Court finds that this was error.  See Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, ... the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Defendant argues that the "ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).  But here, there is no medical testimony opining on Plaintiff's restrictions

1    due to her moderate limitations in concentration, persistence, and pace.  Accordingly, the ALJ's

2    findings are not supported by substantial evidence.[7]

3         **C.     Remand for Further Development of the Record**

4         Plaintiff requests for the Court to remand for payment of benefits.  Defendant counters

5    that remand for further development of the record would be appropriate.  Defendant argues that

6    the objective medical evidence supports that Plaintiff retains the residual functional capacity to

7    perform work, there is conflicting evidence in the record that would make further proceedings

8    useful, and the ALJ did not examine Plaintiff's significant history of drug use because she found

9    Plaintiff not to be disabled despite her significant drug use.  Plaintiff replies that the case should

10   be remanded for benefits because there are no outstanding issues to resolve because Dr. Kumar's

11   opinion supports that Plaintiff is disabled due to her physical impairments.

12        The ordinary remand rule provides that when "the record before the agency does not

13   support the agency action, ... the agency has not considered all relevant factors, or ... the

14   reviewing court simply cannot evaluate the challenged agency action on the basis of the record

15   before it, the proper course, except in rare circumstances, is to remand to the agency for

16   additional investigation or explanation."  Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d

17   1090, 1099 (9th Cir. 2014).  This applies equally in Social Security cases.  Treichler, 775 F.3d at

18   1099.  Under the Social Security Act "courts are empowered to affirm, modify, or reverse a

19   decision by the Commissioner 'with or without remanding the cause for a rehearing.' "  Garrison

20   v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (emphasis in original) (quoting 42 U.S.C. §

21   405(g)).  The decision to remand for benefits is discretionary.  Treichler, 775 F.3d at 1100.  In

22   Social Security cases, courts generally remand with instructions to calculate and award benefits

23   when it is clear from the record that the claimant is entitled to benefits.  Garrison, 759 F.3d at

24   1019.

25        The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which

26   must be satisfied in order for a court to remand to an ALJ with instructions to calculate and

27   ─────────────────────

28   [7] Having found that the ALJ erred in developing the mental residual functional capacity findings, the Court declines
     to address the other issued raised regarding the mental capacity findings.

award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Garrison, 759 F.3d at 1020.  The credit as true doctrine allows "flexibility" which "is properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.  Id. at 1021.  Even when the circumstances are present to remand for benefits, "[t]he decision whether to remand a case for additional evidence or simply to award benefits is in our discretion." Treichler. 775 F.3d at 1102 (quoting Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989)).

In this instance, substantial evidence does not support the ALJ's decision that Plaintiff is able to perform unskilled work.  Although the ALJ found that Plaintiff had moderate limitations in concentration, persistence, and pace, no physician has opined on the affect of these moderate limitations on Plaintiff's capacity to work.   Accordingly, it would be useful for further development of the record to determine how Plaintiff's moderate limitations affect her concentration, persistence, and pace.

Based upon the record, the Court cannot determine that the Commissioner would be required to award benefits in this instance.  It is not clear from the record that Plaintiff's mental condition would preclude work.  As the ALJ noted, the record generally demonstrates normal mental findings and review of the record indicates that on December 5, 2018, her treating provided indicated that there may be "malingering issues." (AR 1285.)  The Court finds that there is an outstanding issue that needs to be resolved by the Commissioner; and this action shall be remanded for further proceedings consistent with this opinion.

On remand, the ALJ shall further develop the record by obtaining a consultative examination by a physician regarding Plaintiff's impairments of bipolar disorder unspecified; mood disorder; and anxiety; and obtaining that physician's opinion regarding what work-related limitations are necessary to account for these impairments.

1

2

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ erred in determining Plaintiff's mental residual functional capacity .  Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED IN PART and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order.  It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Laura Hoesing-Schulz and against Defendant Commissioner of Social Security.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **October 28, 2020**

UNITED STATES MAGISTRATE JUDGE